Consolidated Case Nos. 11-73342 and 11-73356

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY,
GREENACTION FOR HEALTH AND ENVIRONMENTAL JUSTICE, and
EL PUEBLO PARA EL AIRE Y AGUA LIMPIO,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

Respondents,

and

AVENAL POWER CENTER, LLC,

Respondent-Intervenor.

## PETITIONERS' OPENING BRIEF

PAUL R. CORT
GEORGE M. TORGUN
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612
Telephone: (415) 217-2000
Facsimile: (415) 217-2040

*Attorneys for Petitioners Sierra Club,
Center for Biological Diversity, and
Greenaction for Health and
Environmental Justice*

INGRID BROSTROM
BRENT NEWELL
Center on Race, Poverty & the
Environment
47 Kearny Street, Suite 804
San Francisco, CA 94108
Telephone: (415) 346-4179
Facsimile: (415) 436-8723

*Attorneys for Petitioner El Pueblo Para
El Aire y Agua Limpio*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners Sierra Club, Center for Biological Diversity, Greenaction for Health and Environmental Justice, and El Pueblo Para El Aire y Agua Limpio certify that they have no parent companies and that no publicly held corporations own 10 percent or more of the Petitioners.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................v

GLOSSARY ....................................................................................x

CHRONOLOGY OF RELEVANT DATES ........................................................ xi

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION....................................................................2

STATEMENT OF ISSUES ........................................................................2

STATEMENT OF FACTS .........................................................................5

I.      The Avenal Project and Its Location in the Highly Polluted Southern San Joaquin Valley.......................................................................5

II.     The Project Application and Initial EPA Review. ...........................................7

III.    Revised Clean Air Act Requirements for $NO_2$, $SO_2$, and $CO_2$. ......................8

IV.     Avenal Power's Lawsuit Against EPA and the Agency's Approval of the Permit. ....................................................................................9

V.      Petitions to the Environmental Appeals Board. ...........................................12

SUMMARY OF ARGUMENT ....................................................................13

STANDARD OF REVIEW ........................................................................14

I.      Review of EPA Actions Under the Clean Air Act and Administrative Procedure Act.....................................................................................14

II.     Review of EPA's Construction of the Statutory Requirements of the Clean Air Act...................................................................................15

STANDING ......................................................................................18

STATUTORY BACKGROUND....................................................................21

I.      The Clean Air Act. ......................................................................21

II.    Executive Order 12898. ...............................................................23

ARGUMENT ...................................................................................23

I.    The Avenal Permit Does Not Satisfy the Statutory Requirements of Section 165 of the Clean Air Act. ...............................................................23

    A.    EPA's Attempt to Waive Statutory Requirements for the Avenal Project is a Plain Violation of the Clean Air Act. ...............................24

        1.    The requirements in CAA section 165 are clear and unambiguous and do not conflict with any other provision of the Act. ..................................................................................25

        2.    "Grandfathering" is contrary to the statutory structure, purposes, and legislative history of the PSD permitting program. ..................................................................................30

    B.    EPA's Interpretation of the Clean Air Act's PSD Program Requirements is Unreasonable. ........................................................37

        1.    EPA's decision to "grandfather" the Avenal Permit from section 165 directly conflicts with its long-held interpretation of these requirements. .............................................................38

        2.    EPA's attempt to resolve an alleged "conflict or tension" in Section 165 is unreasonable and contrary to the purposes of the PSD program. .................................................................40

        3.    EPA's claim that it possesses "equitable" authority to grandfather the Avenal Permit from section 165 is fundamentally flawed. ..............................................................41

II.    EPA Acted Arbitrarily and Capriciously When its Environmental Justice Analysis Failed to Identify and Address Disproportionate Health and Environmental Effects. ..................................................................46

    A.    EPA Had An Affirmative Duty to Identify the Project's Short-Term $NO_2$ Impacts on Low-Income and Minority Populations. ...................47

    B.    EPA Failed to Consider Evidence that the Avenal Project Disproportionately Impacts Low-Income and Minority Populations. 49

1.  Monitoring Data From Hanford and Visalia.............................50

2.  Near Roadway Impacts. ...........................................51

3.  Air District's NO$_2$ Analysis. .....................................52

CONCLUSION AND RELIEF REQUESTED ........................................54

CERTIFICATE OF COMPLIANCE.......................................57

STATEMENT OF RELATED CASES ...................................................58

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Akhtar v. Burzynski*,
  384 F.3d 1193 (9th Cir. 2004) ..........................................................15

*Andrus v. Glover Constr. Co.*,
  446 U.S. 608 (1980)..........................................................................33

*Bernier v. Bernier*,
  147 U.S. 242 (1893)..........................................................................28

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)..........................................................................44

*Center for Energy and Econ. Dev. v. EPA*,
  398 F.3d 653 (D.C. Cir. 2005)..........................................................21

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)...................................................................passim

*In re EcoElectrica, L.P.*,
  7 E.A.D. 56 (EAB 1997)...................................................................23

*Ecological Rights Found. v. Pac. Lumber Co.*,
  230 F.3d 1141 (9th Cir. 2000) ..........................................................19

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)..........................................................................25

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000)..........................................................................19

*General Motors Corp. v. United States*,
  496 U.S. 530 (1990)................................................................28, 29, 40

*Gottlieb v. Pena*,
  41 F.3d 730 (D.C. Cir. 1994)............................................................29

*Hall v. Norton*,
    266 F.3d 969 (9th Cir. 2001) ...............................................................19

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ................................................................28, 41

*Hunt v. Washington State Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ...............................................................18

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) ...............................................................37

*In re Knauf Fiber Glass, GmbH*,
    8 E.A.D. 121 (EAB 1999) ........................................................48

*Louisiana Pub. Serv. Comm'n v. F.C.C.*,
    476 U.S. 355 (1986) ...............................................................44

*Marbury v. Madison*,
    5 U.S. 137 (1803) ..................................................................43

*Mass. v. EPA*,
    549 U.S. 497 (2007) ...............................................................18

*McLean v. Crabtree*,
    173 F.3d 1176 (9th Cir. 1999) .................................................16

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) ...............................................44

*Mitchell v. Overman*,
    103 U.S. 62 (1880) ................................................................42, 43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*,
    463 U.S. 29 (1983) ................................................................15, 54

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ................................................................44

*Nat'l Wildlife Fed'n v. Gorsuch*,
    693 F.2d 156 (D.C. Cir. 1982) .................................................15

*Natural Res. Def. Council v. EPA*,
  507 F.2d 905 (9th Cir. 1974) .............................................................19

*NRDC v. Sw. Marine, Inc.*,
  236 F.3d 985 (9th Cir. 2000) ..............................................................21

*Nw. Envtl. Advocates v. EPA*,
  537 F.3d 1006 (9th Cir. 2008) ............................................................55

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ........................................................18, 19

*Pauley v. BethEnergy Mines, Inc.*,
  501 U.S. 680 (1991)............................................................................37

*In re Prairie State Generating Company*,
  13 E.A.D. 1 (EAB 2006)......................................................................47

*Resident Councils of Wash. v. Leavitt*,
  500 F.3d 1025 (9th Cir. 2007) ............................................................25

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010) ............................................................14

*In re Shell Gulf of Mexico, Inc. and Shell Offshore, Inc.*,
  OCS Appeal Nos. 10-1 to 10-4, 15 E.A.D. ___ (EAB Dec. 30, 2010) .......49, 53

*Sierra Club v. EPA*,
  346 F.3d 955 (9th Cir. 2003) ..............................................................55

*Sierra Club v. U.S. EPA*,
  --- F.3d ---, 2012 WL 164839 (9th Cir. Jan. 20, 2012)..............................passim

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)............................................................................17

*Soriano v. United States*,
  494 F.2d 681 (9th Cir. 1974) ..............................................................44

*The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*,
  353 F.3d 1051 (9th Cir. 2003) ......................................................16, 17

*United States v. James Daniel Good Real Property*,
    510 U.S. 43 (1993) ................................................................29

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) .........................................................16, 17

*Vigil v. Leavitt*,
    381 F.3d 826 (9th Cir. 2004) ..........................................16, 17

*Wash. Envtl. Council v. Sturdevant*,
    --- F. Supp. 2d ---, 2011 WL 6014664 (W.D. Wash. Dec. 10, 2011) ...............22

*Ziffrin v. United States*,
    318 U.S. 73 (1943) ................................................................42

## CONSTITUTIONAL LAW

U.S. Const. art. III, § 1 ...............................................................43

## STATUTES

5 U.S.C. § 706(2)(A) ................................................................14

42 U.S.C. § 7410 ......................................................................35

42 U.S.C. § 7470 ................................................................30, 36

42 U.S.C. § 7475(a) .........................................................passim

42 U.S.C. § 7475(c) .........................................................passim

42 U.S.C. § 7478(b) ................................................................32

42 U.S.C. § 7479(3) ................................................................22

42 U.S.C. § 7502(c)(1) ...........................................................35

42 U.S.C. § 7601(a)(1) .......................................................16, 27

42 U.S.C. § 7607(b)(1) .........................................................2, 4

42 U.S.C. § 7607(f) ................................................................55

## FEDERAL REGULATIONS

40 C.F.R. § 52.21(b)(12)................................................22

40 C.F.R. § 52.21(j) ..................................................22

40 C.F.R. § 52.21(k) .................................................22

40 C.F.R. § 124.19(a)................................................12

## FEDERAL REGISTER NOTICES

45 Fed. Reg. 52,676 (Aug. 7, 1980)..............................31, 38

59 Fed. Reg. 7,629 (Feb. 16, 1994) ...........................passim

70 Fed. Reg. 65,984 (Nov. 1, 2005)................................39

73 Fed. Reg. 28,321 (May 16, 2008) ...............................38

75 Fed. Reg. 6,474 (Feb. 9, 2010) .................................8

75 Fed. Reg. 17,004 (Apr. 2, 2010) .............................9, 38

75 Fed. Reg. 35,520 (June 22, 2010) ...............................9

76 Fed. Reg. 55,799 (Sept. 9, 2011) ...............................2

## LEGISLATIVE HISTORY

H.R. Rep. No. 94-1175, 94th Cong., 2d Sess. (1976)...............34

H.R. Rep. No. 95-294, 95th Cong., 1st Sess. (1977)..........32, 36

S. Rep. No. 95-127, 95th Cong., 1st Sess. (1977) ................34

# GLOSSARY

APA                    Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

BACT                   Best available control technology

CAA or Act             Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*

$CO_2$                 Carbon dioxide

District               San Joaquin Valley Air Pollution Control District

EPA                    United States Environmental Protection Agency

NAAQS                  National ambient air quality standards

$NO_2$                 Nitrogen dioxide

PER                    Petitioners' Excerpts of Record

ppb                    Parts per billion

PSD                    Prevention of significant deterioration

RTC                    Responses to Public Comments

$SO_2$                 Sulfur dioxide

SSB                    Supplemental Statement of Basis

## CHRONOLOGY OF RELEVANT DATES

| | |
|---|---|
| February 15, 2008 | Avenal Power submits a PSD permit application to EPA Region 9 for the Avenal Energy Project. |
| March 19, 2008 | EPA Region 9 deems the PSD permit application to be administratively complete. |
| June 16, 2009 | EPA Region 9 issues a Statement of Basis for the proposed PSD permit for the Avenal Energy Project. |
| February 9, 2010 | EPA publishes final rule setting new 1-hour $NO_2$ standard, effective April 12, 2010. |
| March 9, 2010 | Avenal Power sues EPA in U.S. District Court for the District of Columbia for failure to render decision on the permit application within 1-year of determining the application to be complete under section 165(c) of the Clean Air Act. |
| April 2, 2010 | EPA publishes final rule determining that $CO_2$ would become subject to regulation under the Clean Air Act for purposes of PSD permitting on January 2, 2011. |
| June 22, 2010 | EPA publishes final rule setting new 1-hour $SO_2$ standard, effective August 23, 2010. |
| September 17, 2010 | EPA argues in the Avenal Power deadline litigation that it could not issue a PSD permit that did not comply with all air quality standards in effect at the time of permit issuance under section 165(a) of the Clean Air Act. |
| January 31, 2011 | EPA argues in the Avenal Power deadline litigation that, under certain narrow circumstances, it is appropriate to "grandfather" PSD permit applications from the requirements of section 165(a) of the Clean Air Act. |
| March 1, 2011 | EPA Administrator Lisa Jackson issues memorandum transferring the permitting authority for the Avenal |

|  | Energy Project from EPA Region 9 to the Assistant Administrator in EPA's Office of Air and Radiation. |
|---|---|
| March 4, 2011 | EPA issues a Supplemental Statement of Basis for the proposed PSD permit that proposes to "grandfather" the Avenal Energy Project from the requirements of section 165(a) of the Clean Air Act and includes an Environmental Justice Analysis for the proposed permit. |
| May 26, 2011 | The district court in the Avenal Power deadline litigation orders EPA to issue a final, non-appealable agency action granting or denying the proposed PSD permit for the Avenal Energy Project by August 27, 2011. |
| May 27, 2011 | EPA issues the PSD permit for the Avenal Energy Project. |
| June 25, 2011 | Petitioner El Pueblo Para El Aire y Agua Limpio petitions for review of EPA's PSD permit decision before the Environmental Appeals Board. |
| June 27, 2011 | Petitioners Sierra Club, Center for Biological Diversity, and Greenaction for Health and Environmental Justice petition for review of EPA's PSD permit decision before the Environmental Appeals Board. |
| August 18, 2011 | The Environmental Appeals Board issues an Order Denying Review of the petitions. |
| September 9, 2011 | EPA publishes notice of its final action to approve the PSD permit for the Avenal Energy Project. |
| November 3, 2011 | Petitioners Sierra Club, Center for Biological Diversity, and Greenaction for Health and Environmental Justice file Petition for Review of EPA's final action. |
| November 4, 2011 | Petitioner El Pueblo Para El Aire y Agua Limpio files Petition for Review of EPA's final action. |
| January 20, 2012 | Petitions for Review are consolidated by the Court. |

## INTRODUCTION

In this appeal, Petitioners Sierra Club, Center for Biological Diversity, Greenaction for Health and Environmental Justice, and El Pueblo Para El Aire y Agua Limpio (collectively, "Petitioners") challenge the United States Environmental Protection Agency's ("EPA") approval of a permit for the construction and operation of the Avenal Energy Project ("Avenal Project" or "Project"), a 600-megawatt natural gas-fired power plant in Avenal, California. EPA's decision to allow this new power plant to be built without meeting current air quality standards or installing the pollution controls mandated by the Clean Air Act ("CAA" or "Act") violates not only the statute's plain language, structure, and Congressional intent, but also turns upside down EPA's own prior court pronouncements and sworn testimony prohibiting such an approach.

In addition, Petitioners challenge EPA's arbitrary and capricious analysis of the Project's disproportionately high and adverse human health effects on minority and low-income populations near the Project site. EPA's approval of the Project based on this faulty analysis cannot be reconciled with the Agency's own requirement that PSD permitting decisions must identify and address such impacts as required by Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-income Populations." The analysis offered by EPA is inadequate in substance and effect and, even in its incomplete

1

state, demonstrates that there will be disproportionate impacts on surrounding environmental justice communities.

Consequently, Petitioners request that this Court vacate EPA's approval and instruct the Agency to deny the permit immediately.

## STATEMENT OF JURISDICTION

This is a petition for review of a final action of EPA made under the Clean Air Act. This Court has jurisdiction pursuant to section 307(b)(1) of the Act, which provides that a petition for review of a final EPA action "which is locally or regionally applicable" may be filed "only in the United States Court of Appeals for the appropriate circuit." 42 U.S.C. § 7607(b)(1). The petition for review must be filed within 60 days from the date the notice of the final action appeared in the Federal Register. *Id*. The final approval in question was published in the Federal Register on September 9, 2011. 76 Fed. Reg. 55,799 (Sept. 9, 2011) [Petitioners' Excerpts of Record ("PER") 001]. The petitions for review were timely filed on November 3 and 4, 2011.

## STATEMENT OF ISSUES

1.      Whether EPA has the authority to waive the Clean Air Act's prevention of significant deterioration requirements for the Avenal Energy Project to demonstrate compliance with the applicable national ambient air quality

standards for nitrogen dioxide and sulfur dioxide, and to include the best available control technology for carbon dioxide emissions.

2.      Whether EPA acted arbitrary and capriciously and abused its discretion when it failed to identify disproportionate adverse health and environmental effects on minority and low-income populations.[1]

## STATEMENT OF THE CASE

At issue in these consolidated cases is EPA's approval of a prevention of significant deterioration permit ("PSD Permit" or "Permit") under the Clean Air Act for the construction and operation of the Avenal Energy Project, a 600-megawatt natural gas-fired power plant in Avenal, California. Under the plain language of Clean Air Act section 165(a), and consistent with EPA's longstanding interpretation of the statute, PSD permit applicants must demonstrate, prior to commencing construction, that a project "will not cause, or contribute to, air pollution in excess of any…national ambient air quality standard [NAAQS]" and that the project is "subject to the best available control technology [BACT] for each pollutant subject to regulation" under the Act. 42 U.S.C. § 7475(a)(3)-(4). EPA's decision to exempt the Avenal Project by "grandfathering" it from these

---

[1] Pursuant to Circuit Rule 28-2.7, all pertinent statutory provisions regarding the Clean Air Act's prevention of significant deterioration ("PSD") permitting program, 42 U.S.C. §§ 7470-79, are contained in Attachment A to this brief.

requirements is contrary to the plain language of the statute and cannot constitute a reasonable interpretation of the Act.

Also at issue is EPA's failure to identify and address the disproportionate health and environmental effects of the Project on nearby low-income and minority populations as required by EPA's own mandates. Record evidence inappropriately excluded from EPA's analysis indicates that the Project's 1-hour nitrogen dioxide emissions will result in disproportionate health and environmental impacts on low-income and minority populations.

Pursuant to section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), Petitioners ask this Court to review EPA's final approval of the PSD Permit for the Avenal Project. Petitioners Sierra Club, Center for Biological Diversity, and Greenaction for Health and Environmental Justice filed a petition for review on November 3, 2011, and Petitioner El Pueblo Para El Aire y Agua Limpio filed a separate petition for review the following day. On November 29, 2011, the Court granted Avenal Power Center, LLC's ("Avenal Power") motion to intervene on behalf of EPA. On January 20, 2012, the Court granted the parties' joint motion to consolidate the two appeals.

4

## STATEMENT OF FACTS

### I.     The Avenal Project and Its Location in the Highly Polluted Southern San Joaquin Valley.

The Avenal Energy Project is proposed to be built and operated in Avenal, California, just a few miles from the environmental justice communities of Avenal, Huron, and Kettleman City.  EPA, Supplemental Statement of Basis, PSD Permit Application for Avenal Energy Project (Mar. 4, 2011) ("SSB") at 16-17 [PER 59-60].  As proposed, the Project would generate electricity from the combustion of natural gas in two 180-megawatt combustion turbine generators, with exhaust from each gas turbine flowing through a dedicated heat recovery steam generator to produce steam to power a shared 300-megawatt steam turbine generator.  EPA, Prevention of Significant Deterioration Permit Issued Pursuant to the Requirements at 40 CFR § 52.21 (May 27, 2011) ("Avenal Permit") at 2 [PER 115].  Additional equipment for the Project includes a natural gas-fired auxiliary boiler, a natural gas-fired emergency generator, and a diesel-fired emergency firewater pump engine. *Id*.  The Project is expected to emit 144.3 tons per year of nitrogen dioxide ("$NO_2$"), 80.7 tons per year of particular matter, 16.7 tons per year of sulfur dioxide ("$SO_2$"), 602.7 tons per year of carbon monoxide, and 1.71 million metric tons per year of carbon dioxide ("$CO_2$").  *See* SSB at 16 [PER 59]; PER 2.

EPA acknowledges that the communities of Avenal, Huron, and Kettleman City include "populations of interest" for the purposes of analyzing impacts on

overburdened communities given that they have a very high (more than 85 percent) minority population, are highly linguistically isolated, and are predominately low-income. *Id*. at 17 [PER 60].[2]  Even without a new 600-megawatt fossil fuel power plant, these communities are already burdened by multiple environmental harms. The San Joaquin Valley is one of the worst-polluted air basins in the nation and suffers from some of the highest ozone and particulate matter levels in the country. *Id*. at 18 [PER 61].  Drinking water in these rural communities is contaminated with high levels of arsenic, benzene, and other toxins.  EPA, Responses to Public Comments on the Proposed Prevention of Significant Deterioration Permit for the Avenal Energy Project (May 27, 2011) ("RTC") at 4-6, 82 [PER 119-21, 139]; Petitioners' Comments on the SSB (Apr. 12, 2011) at 14 [PER 99].  Toxic pesticides and other agricultural chemicals applied to surrounding agricultural fields often drift into the homes and yards of local residents, many of whom also work in the fields.  *Id.*  Additionally, Kettleman City is located adjacent to the Interstate 5 freeway, a sewage sludge processing operation, defunct oil and natural gas extraction operations, and the state's largest hazardous waste landfill, which was recently fined $300,000 for violations of its PCB handling permit.  SSB at 16-

---

[2] The median household income within a 15-km radius from the Project site is more than $20,000 below the state average.  The percent of linguistically isolated households in the State of California is 10 percent compared to 30 percent of households in the 25-km radius around the site.  SSB at 17 [PER 60].

17 [PER 59-60]. These communities are plagued by high unemployment and lack of access to health care, making it difficult to cope with the health impacts associated with high levels of pollution in the area. *Id*. at 17, 25 [PER 60, 68]. Together, these impacts contribute to, among many other harms, higher-than-average asthma rates and other respiratory-related hospitalizations and emergency room visits. *Id*. at 22 [PER 65]. Nearly a quarter of Kings County's children suffer from asthma, the second highest lifetime prevalence rate in California. *Id*. at 23 [PER 66].

Exposure to nitrogen dioxide, a by-product of fossil fuel combustion, is associated with the aggravation of asthma, children's hospital admissions, and emergency room visits. *Id*. at 20 [PER 63]. Persons with preexisting respiratory diseases, children, and older adults may be more susceptible to the effects of $NO_2$ exposure. *Id*. at 21 [PER 64]. Individuals in these sensitive groups may be affected by lower levels of $NO_2$ than the general population or experience a greater impact with the same level of exposure. *Id*. at 20-21 [PER 63-64]. In addition to intrinsically susceptible groups, people living and working near roadways may be at increased vulnerability due to higher exposures. *Id*. at 21 [PER 64].

## II.   The Project Application and Initial EPA Review.

On February 15, 2008, Avenal Power submitted an application for a PSD permit to EPA Region 9 for the Avenal Project. Avenal Permit at 2 [PER 115].

7

EPA Region 9 determined that the permit application was administratively complete on March 19, 2008.  SSB at 1 [PER 44].  On June 16, 2009, EPA Region 9 released a Statement of Basis for its proposed approval of a PSD permit for the Project.  *Id*.  The initial public comment period on the proposed Permit began on June 16, 2009 and closed on October 15, 2009.  *Id*. at 1-2 [PER 44-45].  Petitioners submitted comments on the proposed Permit during this period.  *See* PER 2-20.

## III.    Revised Clean Air Act Requirements for $NO_2$, $SO_2$, and $CO_2$.

On February 9, 2010, while EPA was considering Avenal Power's permit application, EPA published in the Federal Register a final rule revising the national ambient air quality standard for $NO_2$ "in order to provide requisite protection of public health as appropriate under section 109 of the Clean Air Act."  75 Fed. Reg. 6,474, 6,475 (Feb. 9, 2010).  In particular, EPA supplemented the existing annual standard by setting a new 1-hour $NO_2$ standard at 100 parts per billion ("ppb") to provide protection from short−term exposure to elevated $NO_2$ levels, which EPA determined was particularly important for asthmatics and members of other sensitive populations, such as children and the elderly.  *Id*.  The new 1-hour standard became effective on April 12, 2010.  *Id*. at 6,474.  On April 21, 2010, Petitioners submitted comments regarding the new 1-hour $NO_2$ standard and its applicability to the Project.  *See* PER 25-27.

8

During this same period, on April 2, 2010, EPA issued a rulemaking entitled "Reconsideration of Interpretation of Regulations That Determine Pollutants Covered by Clean Air Act Permitting Programs." 75 Fed. Reg. 17,004 (Apr. 2, 2010). In the rulemaking, EPA announced that greenhouse gases ("GHGs"), including $CO_2$, would become "subject to regulation" under the Act for purposes of the PSD program on January 2, 2011. *Id*. at 17,016-19.

On June 22, 2010, EPA published a final rule revising the national ambient air quality standard for $SO_2$ by establishing a 1-hour standard of 75 ppb. 75 Fed. Reg. 35,520 (June 22, 2010). Specifically, EPA replaced the existing 24-hour and annual standards for $SO_2$ with a 1-hour standard due to the serious adverse health effects associated with short-term exposure, especially among asthmatics and other sensitive populations. *Id*. That rule became effective on August 23, 2010. *Id*.

## IV. Avenal Power's Lawsuit Against EPA and the Agency's Approval of the Permit.

On March 9, 2010, Avenal Power filed a lawsuit in the United States District Court for the District of Columbia alleging that EPA violated section 165(c) of the Act, 42 U.S.C. § 7475(c), by failing to render a decision on Avenal Power's permit application within one year of determining the application to be complete. *Avenal Power Center, LLC v. U.S. EPA, et al*., Case No. 1:10-cv-00383 (RJL) (D.D.C. filed Mar. 9, 2010). Avenal Power did not simply seek an order compelling EPA to act, but instead took the unprecedented step of requesting that the court require

9

EPA to issue its PSD permit based on the now superseded NAAQS and without consideration of the new 1-hour health-based standards for $NO_2$ and $SO_2$. *See* Memo. in Support of Avenal Power's Motion for Judgment on the Pleadings Pursuant to Rule 12(c) and Request for Expedited Decision, Case No. 1:10-cv-00383 (RJL), at 26-27 (filed Aug. 25, 2010) [PER 31-32]. While EPA admitted the 1-year period in section 165(c) had passed, it declared, correctly, that it could not issue a PSD permit that did not comply with all air quality standards in effect at the time of the final permit issuance. *See, e.g.*, Declaration of Deborah Jordan, Case No. 1:10-cv-00383 (RJL), at ¶¶ 13-18 (filed Sept. 17, 2010) [PER 37-38]; Memo. in Opp. to Pls.' Motion for Judgment on the Pleadings and in Support of Defs.' Cross-Mot. for Summ. J., Case No. 1:10-cv-00383 (RJL), at 19-20 (filed Sept. 17, 2010) [PER 34-35].

However, in the midst of the litigation and without any explanation, EPA reversed its position and asserted that the Agency had "determined that it is appropriate, under certain narrow circumstances, to grandfather certain PSD applications from the requirement to demonstrate that the proposed facility will not cause or contribute to a violation" of the applicable NAAQS. Declaration of Regina McCarthy, Case No. 1:10-cv-00383 (RJL), at ¶ 6 (filed Jan. 31, 2011) ("McCarthy Decl.") [PER 40]. The Agency then stated that the Avenal Permit was "among those PSD permit applications that EPA believes it is appropriate to

10

grandfather" from section 165's requirements, and that it would issue a supplemental public notice to request comment on this "grandfathering" approach. *Id*. at ¶¶ 6, 8 [PER 40]. In a highly unusual move, EPA Administrator Lisa Jackson then issued a memorandum removing the permitting authority for the Avenal Project from EPA Region 9 and granting Ms. McCarthy, the Assistant Administrator in EPA's Office of Air and Radiation, the authority to issue a final permit decision for the Project. Memorandum from Lisa P. Jackson to Gina McCarthy (Mar. 1, 2011) [PER 43].

On March 4, 2011, EPA released a Supplemental Statement of Basis regarding its proposed issuance of a PSD permit for the Project "to address several considerations that have arisen since the close of the public comment period on the permit." SSB at 1 [PER 44]. Specifically, EPA proposed to "grandfather" the Permit from section 165's requirements (1) to demonstrate that the Project will not cause or contribute to a violation of the 1-hour standards for $NO_2$ or $SO_2$ and (2) to demonstrate that the facility would install best available controls for greenhouse gases, including $CO_2$. *Id*.

EPA also stated that it was "appropriate to provide a detailed Environmental Justice Analysis regarding the proposed PSD permit action for this facility for public comment." *Id*. The Environmental Justice Analysis focused on whether short-term $NO_2$ exposure from the proposed plant would disproportionately impact

11

local communities. *Id*. at 14 [PER 57]. It concluded that EPA does "not have an acceptable analysis . . . that provides a detailed comparison of the facility's emissions, as well as background and nearby sources, with the 1-hour $NO_2$ NAAQS," and that it "cannot reach any definitive conclusion about the specific human health or environmental impacts of short-term exposure to $NO_2$ emissions from the facility on minority and low-income populations." *Id*. at 27 [PER 70]. Petitioners submitted timely comments regarding the Supplemental Statement of Basis on April 12, 2011. *See* PER 86-109.

On May 26, 2011, the district court in the deadline litigation filed by Avenal Power ordered EPA to issue "a final, non-appealable, agency action, either granting or denying plaintiff's permit application, no later than August 27, 2011." Memorandum Opinion, Case No. 1:10-cv-00383 (RJL), at 2, 7-8 (filed May 26, 2011) [PER 111-13]. The following day, EPA issued the PSD Permit authorizing the construction and operation of the Project, as well as its Responses to Public Comments on the proposed Permit. PER 114, 116.

## V. Petitions to the Environmental Appeals Board.

Pursuant to 40 C.F.R. § 124.19(a), Petitioners sought review of EPA's decision on the Permit before the Environmental Appeals Board. On August 18, 2011, the Board issued an Order Denying Review of the petitions. *In re Avenal Power Center, LLC*, PSD Appeal Nos. 11-02 through 11-04, 15 E.A.D. ___ (Aug.

18, 2011). Specifically, the Board found that EPA lawfully delegated the authority to issue the permit to Ms. McCarthy, the Assistant Administrator for the Office of Air and Radiation, *id*., slip op. at 9-14, and that EPA's environmental justice analysis and related conclusions complied with Executive Order 12898, *id*., slip op. at 19-29. With regard to the "grandfathering" issue, the Board "decline[d] to exercise its discretion to review" Petitioners' claims, explaining that it lacked the time to "constructively consider these issues" given the timeframe imposed by the district court in Avenal Power's deadline litigation. *Id*., slip op. at 14-18. The Board summarily denied review of all other issues raised. *Id.*, slip op. at 29.

## SUMMARY OF ARGUMENT

In issuing the PSD Permit for the Avenal Project, EPA violated several basic requirements of the Clean Air Act. First, EPA's determination that it possessed authority to "grandfather" the Project from the requirements of CAA section 165 to demonstrate compliance with the national ambient air quality standards for $NO_2$ and $SO_2$ and best available control technology for $CO_2$ emissions is contrary to the plain language of the statute and cannot constitute a reasonable interpretation of the Act. Second, EPA failed to identify and address disproportionate health and environmental effects on minority or low-income populations of approving the Permit despite evidence in the record that the Project's short-term $NO_2$ emissions would, in fact, exceed federal health-based standards. EPA's approval of the PSD

13

Permit was therefore arbitrary and capricious because it failed to consider the best available evidence on the Project's impacts.

## STANDARD OF REVIEW

### I. Review of EPA Actions Under the Clean Air Act and Administrative Procedure Act.

The Clean Air Act does not specify a standard of review for challenges to EPA approval of PSD permits or other final agency actions. Accordingly, this Court has applied the general standard of review for agency actions provided in section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *Sierra Club v. U.S. EPA*, --- F.3d ---, 2012 WL 164839, *4 (9th Cir. Jan. 20, 2012) (citing *Latino Issues Forum v. EPA*, 558 F.3d 936, 941 (9th Cir. 2009)). Section 706 of the APA states, in relevant part, that: "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (internal quotations, citation omitted). Where an agency has "relied on factors which Congress has not intended it to consider . . . [or] offered an

14

explanation for its decision that runs counter to the evidence before the agency," the court will reverse an agency's action under the arbitrary and capricious standard of review. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

## II. Review of EPA's Construction of the Statutory Requirements of the Clean Air Act.

When reviewing EPA's construction of a statute, this Court follows the two-part test established in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984). *See, e.g.*, *Sierra Club,* --- F.3d ---, 2012 WL 164839, \*4. The first step is to determine whether Congress has spoken directly to the precise question at issue. *Akhtar v. Burzynski*, 384 F.3d 1193, 1198 (9th Cir. 2004) (citing *Chevron,* 467 U.S. at 842). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*.

If the statute is silent or ambiguous concerning the issue at hand, under *Chevron* Step 2 "'the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Sierra Club*, --- F.3d ---, 2012 WL 164839, \*4 (quoting *Chevron*, 467 U.S. at 843). Nonetheless, the Court owes no deference to agency interpretations that construe the statute "in a way that is contrary to congressional intent or that frustrates congressional policy." *Akhtar,* 384 F.3d at 1198; *see Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 171 (D.C.

15

Cir. 1982) (where "EPA's interpretation is inconsistent with the language of the [statute], as interpreted in light of the legislative history, or if it 'frustrate[s] the policy that Congress sought to implement,' no amount of deference can save it") (citations omitted).

Moreover, *Chevron* Step 2 deference is only appropriate where "the agency can demonstrate that it has the general power to 'make rules carrying the force of law' and that the challenged action was taken 'in the exercise of that authority.'" *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1067 (9th Cir. 2003) (quoting *United States v. Mead Corp*., 533 U.S. 218, 226-27 (2001)); *see also Vigil v. Leavitt,* 381 F.3d 826, 834 (9th Cir. 2004) (finding that *Chevron* deference did not apply to EPA statutory interpretations where "EPA has not, in fact, exercised its general rulemaking authority to define these terms"); *McLean v. Crabtree*, 173 F.3d 1176, 1184 (9th Cir. 1999) (Bureau of Prisons rule not codified in Code of Federal Regulations, although published in Federal Register and subject to notice and comment, only entitled to "some deference"). "A very good indicator of delegation meriting *Chevron* treatment [is] express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Mead*, 533 U.S. at 229.

Although Congress has given EPA general rulemaking authority with respect to the Clean Air Act, 42 U.S.C. § 7601(a)(1), EPA has not exercised such

16

authority with regard to its new approach to "grandfather" the Avenal Permit from the requirements of section 165. Instead, as discussed above, EPA's interpretation of these Clean Air Act requirements was announced in litigation brought by Avenal Power as part of an alleged "policy review," and is further discussed in its Supplemental Statement of Basis for the Avenal Project. McCarthy Decl., ¶¶ 5, 6 [PER 40]; SSB at 2-11 [PER 45-54]. "'Interpretations such as those . . . contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.'" *Vigil*, 381 F.3d at 835 (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)).

As this Court has explained, actions such as the grandfathering decision here "even if not authoritative for purposes of *Chevron*, are entitled to so-called *Skidmore* deference insofar as they 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Vigil*, 381 F.3d at 835 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "Under *Mead* and *Skidmore*, the weight that we are to give an administrative interpretation not intended by an agency to carry the general force of law is a function of that interpretation's thoroughness, rational validity, and consistency with prior and subsequent pronouncements." *Wilderness Soc'y*, 353 F.3d at 1068.

## STANDING

Petitioners have standing to challenge EPA's approval of the PSD Permit for the Avenal Project, which directly affects the health and aesthetic interests of their members. An organization has standing to bring an action on behalf of its members if: (1) neither the claim asserted nor the relief requested requires its members to participate directly in the lawsuit; (2) it is seeking to protect interests that are germane to its purpose; and (3) its members would have standing to sue individually. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Here, direct participation of the members of Petitioners' organizations is unnecessary. Second, the interests Petitioners seek to advance through this litigation fall squarely within each of their organization's missions. *See* Declarations of Yolanda Fortuna, ¶ 4; Gordon Nipp, ¶¶ 3-5; Kassia R. Siegel, ¶¶ 2-8; Mavi Sandoval, ¶ 4; Bradley Angel, ¶¶ 4-5; Maria Saucedo, ¶¶ 2; Maricela Mares-Alatorre, ¶ 3 (all declarations are provided in Attachment B, hereto). Third, these organizations each have members with standing to bring this suit individually.[3] To satisfy this final prong of the test, Petitioners must show that (1) at least one of its members has suffered an "injury in fact;" (2) the injury is fairly

---

[3] Only one Petitioner need establish standing. *Mass. v. EPA*, 549 U.S. 497, 518 (2007); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 809 n.3 (9th Cir. 2005).

traceable to EPA's illegal conduct; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).

Petitioners' members satisfy the "injury in fact" requirement. This Court has held that a plaintiff "will suffer injury if compelled to breathe air less pure than that mandated by the Clean Air Act." *Natural Res. Def. Council v. EPA*, 507 F.2d 905, 910 (9th Cir. 1974); *see Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001) ("evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants" establishes injury in fact). Further, aesthetic injury suffices to confer standing. *Laidlaw*, 528 U.S. at 183. To satisfy this requirement, a party need not show actual harm; "an increased risk of harm can itself be injury in fact sufficient for standing." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000); *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2004) (injury in fact existed where agency's issuance of a permit authorizing an oil company to build an addition to its oil refinery dock increased the risk of an oil spill, an event that would harm plaintiffs' interests).

Petitioners' members allege concrete injuries because, as residents of communities near the Avenal Project, they are "compelled to breathe" pollution from a Project that will not be required to meet the public health-based requirements of the Clean Air Act. Nipp Decl., ¶¶ 3-4; Sandoval Decl., ¶¶ 6, 9;

19

Saucedo Decl., ¶ 3; Mares-Alatorre Decl., ¶ 4. These members are concerned about the effects of pollution from the Avenal Project on their health and the health of their families. Nipp Decl., ¶¶ 4-6; Sandoval Decl., ¶¶ 5-10; Saucedo Decl., ¶¶ 4-7; Mares-Alatorre Decl., ¶ 6-7. For example, Sierra Club member Gordon Nipp, who regularly leads hiking trips in the San Joaquin Valley and the Sierra Nevada and Santa Monica Mountains, has suffered from respiratory problems due to poor air quality for many years and is concerned about the effects of additional pollution on air quality and visibility in the region. Nipp Decl., ¶¶ 3-6. Center for Biological Diversity member Mavi Sandoval suffers from severe allegies during periods of poor air quality, and her 12-year old son has experienced allegies and asthma symptoms for most of his life. Sandoval Decl., ¶¶ 6-7. Greenaction member Maria Saucedo worries about the impacts of additional pollution sources on her health and the health of her husband and children, who already suffer from asthma and other respiratory problems due to poor air quality in the Valley. Saucedo Decl., ¶¶ 3-7. El Pueblo member Maricela Mares-Alatorre has respiratory issues that are exacerbated on bad air days and is concerned about the effects of air pollution on the health of her family. Mares-Alatorre Decl., ¶¶ 6-7.

Petitioners also satisfy the traceability requirement for standing. The physical and aesthetic harms suffered by their members are traceable to EPA's illegal conduct. Had EPA disapproved the PSD Permit for the Avenal Project as

20

required by the Clean Air Act, no additional pollution would result from the construction and operation of the proposed power plant. *See, e.g., NRDC v. Sw. Marine, Inc.*, 236 F.3d 985, 994-95 (9th Cir. 2000) (to satisfy traceability requirement, defendant's conduct need only cause or contribute to alleged injury).

Finally, a favorable order by this Court will provide redress to Petitioners for the illegal and harmful effects of EPA's violations of the Clean Air Act. An order vacating EPA's approval of the Avenal Project with instructions to disapprove the PSD Permit would prevent any illegal pollution from the Project and require EPA to engage in a new public process that complies with the Clean Air Act before the Project could be approved. *See, e.g., Center for Energy and Econ. Dev. v. EPA*, 398 F.3d 653, 657 (D.C. Cir. 2005) (holding that "the redressability requirement may be satisfied . . . by vacating the challenged rule and giving the aggrieved party the opportunity to participate in a new rulemaking") (quotations omitted).

For the above reasons, Petitioners have standing to challenge EPA's approval of the Avenal Project.

## STATUTORY BACKGROUND

## I.     The Clean Air Act.

The Clean Air Act prohibits the construction of new major stationary sources of air pollution in areas that meet any of the national ambient air quality standards except in accordance with a PSD permit. 42 U.S.C. § 7475(a); *see also*

*id*. § 7470 (defining purposes of PSD permitting program).  In order to receive a PSD permit for a major source, applicants must, among other requirements, perform a thorough analysis of the air quality impacts that a proposed project will generate and demonstrate that the proposal will not cause or contribute to an exceedance of any applicable national ambient air quality standards.  42 U.S.C. § 7475(a)(3); 40 C.F.R. § 52.21(k).  The Act also prohibits the issuance of a PSD permit unless it includes best available control technology to control emissions of "each pollutant subject to regulation under [the Act] emitted from, or which results from" a proposed facility.  42 U.S.C. § 7475(a)(4); 40 C.F.R. § 52.21(j); *Wash. Envtl. Council v. Sturdevant*, --- F. Supp. 2d ---, 2011 WL 6014664, *8 (W.D. Wash. Dec. 10, 2011) ("PSD programs require major emitting facilities in 'attainment' regions to obtain PSD permits and demonstrate that the facility implements best available control technology…for air pollutants, including GHG emissions") (citing 42 U.S.C. §§ 7470–79).  Determining best available control technology requires a comprehensive analysis of all potentially available emission control measures, including input changes (such as the use of clean fuels), process and operational changes, and the use of add-on control technology.  42 U.S.C. § 7479(3); 40 C.F.R. § 52.21(b)(12).

## II.    Executive Order 12898.

In 1994, President Clinton signed Executive Order 12898 entitled "Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations."  Executive Order 12898 states in relevant part that:

> [E]ach Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations.

Section 1-101 of Exec. Order 12898, 59 Fed. Reg. 7,629 (Feb. 16, 1994).

The Environmental Appeals Board requires that EPA comply with Executive Order 12898 pursuant to its PSD authority and consider environmental justice in the permitting process when there is any "superficially plausible" claim that a minority or low-income population may be disproportionately affected by a particular facility.  *In re EcoElectrica, L.P.*, 7 E.A.D. 56, 69 (EAB 1997).

## ARGUMENT

## I.    The Avenal Permit Does Not Satisfy the Statutory Requirements of Section 165 of the Clean Air Act.

Section 165 of the Clean Air Act requires PSD permit applicants to demonstrate, prior to commencing construction, that a project "will not cause, or contribute to, air pollution in excess of any… national ambient air quality standards" and that the project is "subject to the best available control technology for each pollutant subject to regulation" under the Act.  42 U.S.C. § 7475(a)(3)-(4).

23

Here, EPA admits that the Project will not meet these statutory requirements. RTC at 3 n.1, 8-9 [PER 118, 123-24]. Rather, because of alleged "delay" in processing the Avenal Permit application, EPA decided to "grandfather" the Project from demonstrating that it will not cause or contribute to a violation the 1-hour $NO_2$ and $SO_2$ standards and from the requirement to install best available controls for the regulated pollutant $CO_2$. *Id*. Because EPA's decision to "grandfather" the Project is contrary to the plain language of the Clean Air Act, and otherwise does not constitute a reasonable interpretation of the statute, the Court must vacate EPA's approval and instruct the Agency to deny the Permit immediately.

### A. EPA's Attempt to Waive Statutory Requirements for the Avenal Project is a Plain Violation of the Clean Air Act.

EPA's approval of the Avenal Permit, notwithstanding the admitted failure of the Project to comply with the requirements of Clean Air Act section 165, is wholly inconsistent with the clearly expressed intent of Congress in the Act. To determine whether "Congress has directly spoken to the precise question at issue," courts are to apply the "traditional tools of statutory construction." *Chevron*, 467 U.S. at 542-43 & n.9. As this Court has previously stated:

> These tools of construction require us first to engage in a textual analysis of the relevant statutory provisions and to read the words of statutes in their context and with a view to their place in the overall statutory scheme. If the proper interpretation is not clear from this textual analysis, the legislative history offers valuable guidance and insight into Congressional intent.

24

*Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025, 1031 (9th Cir. 2007)

(citations and quotation omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (finding that "[i]t is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme'") (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Applying these traditional tools here, it is clear that the Clean Air Act does not allow EPA to exempt a project from the express requirements of section 165 governing the issuance of a PSD permit.

### 1. The requirements in CAA section 165 are clear and unambiguous and do not conflict with any other provision of the Act.

The plain and unambiguous language of Clean Air Act section 165 does not confer EPA with any authority to exempt, or "grandfather," the Avenal Permit from the statute's requirements for PSD permits. As section 165(a) provides:

> *No major emitting facility on which construction is commenced after August 7, 1977, may be constructed* in any area to which this part applies *unless—*
> …
> (3) *the owner or operator of such facility demonstrates*, as required pursuant to section 7410(j) of this title, *that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any*
> (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year,

(B) *national ambient air quality standard in any air quality control region*, or

(C) any other applicable emission standard or standard of performance under this chapter; [and]

(4) *the proposed facility is subject to the best available control technology for each pollutant subject to regulation* under this chapter emitted from, or which results from, such facility….

42 U.S.C. § 7475(a) (emphasis added). The plain language of section 165 defines the applicability of these provisions based on when construction commences, not from when EPA deems the permit application to be complete. *Id*. (imposing requirements on facilities "on which construction is commenced after August 7, 1977"). The only major emitting facilities that are exempted by this plain language are those for which construction commenced by August 7, 1977. *Id*. § 7475(a); *see also id*. § 7478(b). The statutory language is clear and provides no exception for the Avenal Project.

Notably, EPA does not contend that this statutory language is uncertain or ambiguous in any way. Nowhere in EPA's various statements of basis, responses to comments, or final permit decision does EPA describe any such ambiguity. Nor does EPA identify any authority in the statute that empowers the Agency to waive these express requirements. *See* SSB at 10 [PER 53] ("The Act does not expressly authorize EPA to waive the substantive permitting criteria when a permit

26

application has not been granted or denied within the one-year deadline").[4]
Instead, EPA alleges that "there is a conflict or tension between provisions of the
CAA" when the Agency has failed to complete action on a permit within one year
as required by section 165(c) and new standards have become applicable during
that period.  RTC at 54-55 [PER 127-28]; *see also* SSB at 10 [PER 53] ("EPA
must consider how to reconcile what have now become conflicting statutory
obligations").

　　　The premise of EPA's argument is false.  EPA's failure to meet the deadline
in section 165(c) for acting on the Permit does not create a "conflict or tension"
with the requirements of section 165(a) to ensure that new sources will not cause
or contribute to air pollution problems and will be subject to best available control
technology.  If EPA cannot meet the deadline requirement while also meeting its
statutory obligations regarding air quality protection, the appropriate resolution is
to deny the permit application.  That is what EPA should have done here.  EPA's
"grandfathering" scheme not only fails to remedy the Agency's inability to meet

---

[4] In its Responses to Comments, EPA notes that it "has previously exercised [its]
discretion to establish grandfathering provisions in regulations" pursuant to its
authority under CAA section 301(a)(1).  RTC at 54 [PER 127].  Section 301(a)(1)
states that EPA "is authorized to prescribe such regulations as are necessary to carry
out [its] functions under [the Act]."  42 U.S.C. § 7601(a)(1).  This provision in no way
authorizes EPA to revise or ignore the statutory requirements for PSD permits in
section 165 and, in any case, is not applicable here given that the EPA Administrator
has not undertaken notice and comment rulemaking to "grandfather" the Avenal
Permit.

27

the 1-year deadline, but it also causes additional violations of its statutory obligations, an outcome that defies any logical reading of the statute.

Moreover, EPA cannot simply invent a "conflict" between two statutory provisions in order to completely undo one of them. A fundamental canon of statutory construction is that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal quotation and citation omitted); *see Bernier v. Bernier*, 147 U.S. 242, 245 (1893) ("[I]t is a general rule, without exception, in construing statutes, that effect must be given to all their provisions, if such a construction is consistent with the general purposes of the act, and the provisions are not necessarily conflicting.").

In fact, EPA's faulty line of reasoning has already been considered and refuted by the U.S. Supreme Court in *General Motors Corp. v. United States*, 496 U.S. 530 (1990). In *General Motors*, industry argued that EPA's failure to act on a state implementation plan ("SIP") revision within the statutory period for review under section 110 of the Act precluded EPA from enforcing the existing provisions of the SIP under section 113. *Id.* at 535. The Supreme Court rejected the contention that there was a conflict in the statute, holding that delay on the part of EPA does not affect the Agency's ability to enforce the other requirements of the Act. *Id.* at 539-42. Specifically, the Court found that "[b]ecause the statute does

28

not reveal any congressional intent to bar enforcement of an existing SIP if EPA delays unreasonably in acting on a proposed SIP revision,…such an enforcement action is not barred." *Id*. at 540. The Court also noted that "other statutory remedies are available when EPA delays action... . Although these statutory remedies may not appear to be so strong a deterrent to EPA delay as would an enforcement bar, these are the remedies that Congress has provided in the statute." *Id*. at 541.

The *General Motors* case is not distinguishable, as EPA contends, on the basis that it "concerned enforcement of a SIP, not issuance of a permit." *See* RTC at 60 [PER 133]. The Supreme Court specifically determined that EPA's delay in implementing one provision of the Clean Air Act does not affect the applicability of other requirements unless the statute provides otherwise. *General Motors*, 496 U.S. at 540-42; *see also United States v. James Daniel Good Real Property*, 510 U.S. 43, 63 (1993) ("We have held that if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction"). Instead, "the proper recourse for a party aggrieved by delay that violates a statutory deadline is to apply for a court order compelling agency action," a remedy specifically authorized by section 304(a)(2) of the Act. *See Gottlieb v. Pena*, 41 F.3d 730, 734 (D.C. Cir. 1994). In sum, if the Avenal Permit application is inadequate to meet all

29

applicable statutory requirements and EPA is compelled to act on the Permit, the
plain and unambiguous language of section 165 of the Clean Air Act requires that
the Avenal Permit be denied.

> **2.** **"Grandfathering" is contrary to the statutory structure, purposes, and legislative history of the PSD permitting program.**

The statutory structure and purposes of the Clean Air Act's PSD permitting
program also demonstrate that EPA's decision to exempt the Avenal Permit from
the requirements of section 165 is not permissible under the Act.  In particular, the
express purposes of the PSD program include:

> (1) to protect health and welfare from any actual or potential adverse
> effect which may be reasonably anticipate[d] to occur from air
> pollution…notwithstanding attainment and maintenance of all
> national ambient air quality standards;
> (2) to preserve, protect, and enhance air quality in national parks…and
> other areas of special…value;
> (3) to insure that economic growth will occur in a manner consistent
> with the preservation of existing clean air resources; [and]
> (5) to assure that any decision to permit increased air pollution…is
> made only after careful evaluation of all the consequences of such a
> decision and after adequate procedural opportunities for informed
> public participation in the decisionmaking process.

42 U.S.C. § 7470.  EPA's decision – which would allow the Project to be built
without a demonstration that it will not cause or contribute to a violation of air
pollution standards that are designed to protect public health and welfare – cannot
be reconciled with any of these stated purposes.  "Grandfathering" the Project does
not protect public health, preserve air quality, or insure economic growth

consistent with the preservation of air resources, and precludes careful decisionmaking and informed public participation.

When EPA adopted regulations implementing the PSD program in 1980, the Agency expressly rejected similar requests for "grandfather" exemptions based on these same clearly stated statutory purposes. 45 Fed. Reg. 52,676 (Aug. 7, 1980). Specifically, in its final rule, EPA rejected a commenter's suggestion that EPA "promulgate a grandfather provision that would use the date of complete application instead of the date of permit issuance" in determining the applicability of section 165's requirements. *Id*. at 52,683. As the Agency noted, the "[u]se of such date, however, might exempt more projects from review" and "fail to give adequate expression to the interests behind section 165, especially the goal of protecting air quality." *Id*.

In its Responses to Comments, EPA claims that its decision to "grandfather" the Avenal Permit is consistent with the purpose of section 160(3) of "insur[ing] that economic growth will occur in a manner consistent with the preservation of existing clean air resources." RTC at 59 [PER 132]. Plainly, however, EPA cannot show that exempting the Avenal Permit (and potentially more projects in the future) from applicable clean air standards is "consistent with the preservation of existing clean air resources." The Avenal Project promises to increase emissions of pollutants such as $NO_2$ beyond levels that EPA has found to cause

adverse public health impacts. Yet EPA is waiving all requirements to show that these increases will be consistent with the health-based standard for $NO_2$ adopted by the Agency. This is not "balancing" growth and air quality protection; it is ignoring air quality protection. EPA's suddenly cavalier attitude toward the enforcement of clean air standards is particularly egregious given that the Project will be located among several environmental justice communities that are already disproportionately impacted by pollution sources that are causing serious health consequences, as discussed below.

When Congress adopted the PSD permitting program, it understood that certain sources might be affected by changing permit requirements. *See* H.R. Rep. No. 95-294, 95th Cong., 1st Sess., at 171 (1977) ("Safeguards against moratorium growth"). Consequently, Congress limited the applicability of these new requirements in several ways, such as exempting existing sources and requiring only "major sources of air pollution" to obtain PSD permits. *Id*.; *see* 42 U.S.C. § 7475(a). Congress also provided specific "grandfathering" relief to sources on which "construction had commenced" before the enactment of the 1977 Clean Air Act Amendments. *See* 42 U.S.C. § 7478(b) ("In the case of a facility on which construction was commenced…after June 1, 1975, and prior to August 7, 1977, the review and permitting of such facility shall be in accordance with the regulations for the prevention of significant deterioration in effect prior to August 7, 1977.").

32

Where, as here, Congress has provided express exemptions and not others, EPA is not free to invent new authority to waive otherwise applicable statutory requirements. *See Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). EPA's attempt to distinguish *Andrus* based on the factual circumstances in that case misses the point of this fundamental canon of statutory construction. *See* RTC at 56 [PER 129]. In particular, it is disingenuous for EPA to claim that the exemption in section 168(b) does not "expressly relate" to the application of PSD permitting requirements in section 165, *see id*., since these provisions were enacted together and are clearly part of the same PSD permitting program. In fact, EPA admits that "[t]he CAA does not contain any express exemption" regarding the requirements in section 165 that would apply in this case, *id*., and that the section 168(b) exemption "is clearly different from grandfathering when EPA promulgates a new NAAQS or regulates a new pollutant." *Id*. at 56-57 [PER 129-30]. Petitioners agree that there is no other exemption that allows EPA to ignore current air quality standards or controls on newly regulated pollutants. This is the point – Congress, while providing some exceptions, did not provide the one EPA is attempting to invent here.

33

In enacting the PSD program, Congress also made the fundamental policy choices that (1) it is preferable to prevent air pollution from becoming a problem in the first place by limiting pollution created by newly constructed sources; and (2) controls should be installed when new sources are being constructed rather than as retrofits on existing sources. *See* S. Rep. No. 95-127, 95th Cong., 1st Sess., at 11 (1977) ("This legislation defines 'significant deterioration' in all clean air areas as a specified amount of additional pollution.... This definition is intended to prevent any major decline in air quality currently existing in clean air areas and will provide a margin of safety for the future."); H.R. Rep. No. 94-1175, 94th Cong., 2d Sess., at 101 (1976) (noting that "'an ounce of prevention is worth a pound of cure'" and explaining that "[p]ermitting unrestricted deterioration of air quality up to ambient standards involves trying to cure a condition after it has developed rather than using practical and currently available means to prevent or minimize the condition in the first place"); *id.* at 108 ("Common sense dictates that it is substantially less expensive to prevent air pollution problems – and health problems – before they develop than it is to abate dangerous pollution levels.... This approach will allow us to avoid future massive air pollution concentrations which endanger public health and restrict further economic growth, require expensive retrofitting of pollution control technology and produce demands for economically and socially disruptive restrictions on the use of automobiles and on

34

indirect sources.").  EPA's approach here actively defeats both of these policy goals.

By exempting the Avenal Permit, EPA is allowing the Project to be built without a demonstration that it will not cause or contribute to a violation of the 1-hour national ambient air quality standards for $NO_2$ or $SO_2$.  If the plant is built and it is subsequently determined that violations are occurring as a result of the substantial emissions from this Project, the State and the local air district will be responsible for developing a plan for controlling emissions to meet the standard. 42 U.S.C. §§ 7410, 7502.  Such a plan would require the adoption of reasonably available control technology requirements for existing major sources.  42 U.S.C. § 7502(c)(1).  At that point, Avenal Power could be required to address these emissions in a much less cost-effective manner through the retrofit of the facility. Thus, "grandfathering" the Permit from section 165's requirements, and ignoring the foreseeable pollution problems that the PSD program is specifically designed to avoid, clearly undermines the "prevention" purpose of the PSD program and the policy choices made by Congress.

In its Responses to Comments, EPA claims that the legislative history of the PSD program "illustrates Congressional intent to avoid a moratorium on construction and delays in permit processing."  RTC at 59 [PER 132]. Specifically, EPA cites a single sentence from a House Report which notes that "to

35

prevent disruption of present and planned sources, the committee has authorized extensive 'grandfathering' of both existing and planned sources." *Id*. (quoting H.R. Rep. No. 95-294 at 171). However, this statement addressed the specific exemptions that Congress provided when it enacted the PSD permitting program; instead of supporting EPA's position, it affirms the narrow scope of those exemptions. *See* H.R. Rep. 95-294 at 171-72. To the extent Congress recognized and intended to address this concern, it did so without creating the exemption EPA is inventing here. To the extent that EPA is implying that Congress was willing to forgo air quality protection in favor of avoiding disruption, that notion is specifically rejected by the express language of section 160(3), which requires that economic growth occur in a manner consistent with the preservation of clean air resources. 42 U.S.C. § 7470(3).

The statutory language of Clean Air Act section 165(a) is plain – a new source must demonstrate that it will not cause or contribute to a violation of any national ambient air quality standards and that it will install the best available control technology for all regulated pollutants. Unless the source can meet these criteria, it may not be built. The Avenal Project does not meet these criteria. The statute provides no authority for EPA to waive these requirements except in limited circumstances set forth in the Act. Because Congress has spoken directly on the

matter, the Court must reject EPA's attempt to waive these statutory requirements by "grandfathering" the Avenal Permit.

### B. EPA's Interpretation of the Clean Air Act's PSD Program Requirements is Unreasonable.

As discussed above, the plain language, structure, and intent of the Clean Air Act prohibits EPA from "grandfathering" the Avenal Permit from the express statutory requirements of the PSD permitting program. Yet even if the Act were ambiguous in this regard, which it is not, EPA's interpretation cannot constitute a permissible construction of the statute and must be rejected by this Court. *See Chevron*, 467 U.S. at 843.[5]

EPA's "grandfathering" approach conflicts not only with Congress's expressed intent regarding the PSD permitting program, as discussed above, but also with the Agency's own prior interpretations of the requirements in section 165. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view") (internal quotations omitted); *Pauley v. BethEnergy Mines, Inc*., 501 U.S. 680, 698 (1991) ("As a general matter, of course, the case for judicial

---

[5] Petitioners here analyze EPA's argument under *Chevron* "Step 2" but note that because the Avenal Permit decision was not the product of formal rulemaking, it is not entitled to *Chevron*-type deference.

deference is less compelling with respect to agency positions that are inconsistent with previously held views.").  EPA's alleged equitable power to "grandfather" the Project in the absence of any statutory authority has no basis in the Clean Air Act or any relevant case law and must be rejected by this Court.

> ### 1. EPA's decision to "grandfather" the Avenal Permit from section 165 directly conflicts with its long-held interpretation of these requirements.

EPA's "grandfathering" approach for the Avenal Permit is contrary to the Agency's long-held views regarding the requirements of Clean Air Act section 165.  As noted above, EPA long ago rejected an approach that would have used the date an application was complete, rather than the date of permit issuance, as the basis for determining section 165's applicability because "it would fail to give adequate expression to the interests behind section 165, especially the goal of protecting air quality."  45 Fed. Reg. at 52,683.  When EPA has regulated pollutants or issued new or revised national ambient air quality standards since that time, it has consistently stated that any PSD permit application must meet the standards in effect when the permit is *issued*.  *See, e.g*., 75 Fed. Reg. 17,018-21 (regulation of GHGs) ("in the absence of an explicit transition or grandfathering provision in the applicable regulations…, each PSD permit *issued* on or after January 2, 2011 would need to contain provisions that satisfy the PSD requirements that will apply to GHGs as of that date"); 73 Fed. Reg. 28,321,

28,340 (May 16, 2008) (revised $PM_{2.5}$ standard) ("section 165 of the CAA suggests that PSD requirements become effective for a new NAAQS upon the effective date of the NAAQS"); 70 Fed. Reg. 65,984, 66,043 (Nov. 1, 2005) (same).

Indeed, when EPA adopted the new 1-hour $NO_2$ standard at issue here, it issued a memorandum regarding the applicability of PSD requirements to the new standard, explaining:

> EPA generally interprets the CAA and EPA's PSD permitting program regulations to require that each final PSD permit decision reflect consideration of any NAAQS that is in effect at the time the permitting authority *issues* a final permit. As a general matter, permitting and licensing decisions of regulatory agencies must reflect the law in effect at the time the agency makes a final determination on a pending application. *See Ziffrin v. United States*, 318 U.S. 73, 78 (1943); *State of Alabama v. EPA*, 557 F.2d 1101, 1110 (5th Cir. 1977); *In re Dominion Energy Brayton Point, LLC*, 12 E.A.D. 490, 614-16 (EAB 2006); *In re Phelps Dodge Corp*., 10 E.A.D. 460, 478 n. 10 (EAB 2002). Consistent with such interpretations, EPA has previously concluded that the relevant provisions cover any NAAQS that is in effect at the time of *issuance* of any permit.

Memo from Stephen D. Page, Director, OAQPS, EPA, to EPA Regional Air Division Directors (Apr. 1, 2010) ("Page Memo") at 2 [PER 22] (emphasis added). EPA concluded that "permits issued under 40 CFR 52.21 on or after April 12, 2010, must contain a demonstration that the source's allowable emissions will not cause or contribute to a violation of the new 1-hour $NO_2$ NAAQS." *Id*. at 3 [PER 23].

In the district court litigation brought by Avenal Power, EPA again reaffirmed its position that it has "consistently interpreted the plain language of the Clean Air Act to require that each final PSD permit decision reflect consideration of any NAAQS in effect *at the time the permitting authority issues a final permit*." PER 34. Thus, EPA's decision to "grandfather" the Avenal Permit from section 165 directly conflicts with its own prior interpretation and court representations of these statutory requirements and should be rejected by this Court.

> **2.** **EPA's attempt to resolve an alleged "conflict or tension" in Section 165 is unreasonable and contrary to the purposes of the PSD program.**

In its Responses to Comments, EPA asserts that it is free to waive the requirements of section 165 because there is an alleged "conflict or tension" when the Agency has not completed action on a permit within one year as set forth in section 165(c) and new standards under section 165(a) have become applicable during that time period. RTC at 54-55 [PER 126-27] (emphasis added); *see also* SSB at 10 [PER 53]. Not only has this faulty line of reasoning already been rejected by the Supreme Court in *General Motors*, *see supra* at Part I.A.1, but EPA's proposed solution of "grandfathering" the Avenal Permit from applicable legal requirements contravenes the express purposes of the PSD program -- preventing air pollution problems from occurring and requiring appropriate controls to be included at the outset of facility construction. *Id*. at Part I.A.2.

40

Moreover, EPA has improperly construed two supposedly "conflicting" statutory provisions so as to render one of them, section 165(a), wholly "inoperative or superfluous, void or insignificant." *Hibbs v. Winn,* 542 U.S. at 101. By contrast, implementing sections 165(a) and 165(c) so as to require EPA to deny an inadequate permit if it is compelled to act on it within one year gives full effect to both provisions.

In short, the statutory "conflict" EPA uses to justify its pollution control waiver does not exist, and EPA's proposal to address a deadline violation of the Act under section 165(c) by causing additional violations of the Act (*i.e.*, failure to meet the requirements in section 165(a)) cannot constitute a reasonable interpretation of the statute.

> **3.    EPA's claim that it possesses "equitable" authority to grandfather the Avenal Permit from section 165 is fundamentally flawed.**

Having no *statutory* authority to "grandfather" the Avenal Permit from the plain statutory requirements of the Clean Air Act, EPA instead attempts to invent new "*equitable*" authority based on a shoddy legal analysis of a single federal district court case from 50 years ago. SSB at 9-10 [PER 52-53]; RTC at 61-65 [PER 134-38]. EPA's analysis is based on a faulty understanding of the fundamental powers of the various branches of government, ignores a long line of authority that has addressed this very issue, and cannot be sustained by this Court.

41

Courts have consistently recognized that an agency is required to apply the law in effect at the time it renders a decision on a permit application. *See Ziffrin v. United States*, 318 U.S. 73, 78 (1943). *Ziffrin* involved a challenge to an order issued by the Interstate Commerce Commission denying a company's application for a permit to continue contract carrier obligations. *Id*. at 74. After the company submitted its application but before the agency issued its decision, Congress amended a provision of the statute governing such permits. *Id*. The Court held that, even where the law changes after an applicant files a permit application, the Commission "was required to act under the law as it existed" when it entered its decision on the application. *Id*. at 78. Otherwise, reasoned the Court, "the administrative body would issue orders contrary to the existing legislation." *Id*. As noted above, EPA has consistently applied this basic rule. *See* Page Memo at 2 [PER 22]; PER 34 ("Supreme Court precedent and other cases support EPA's interpretation that permitting and licensing decisions of regulatory agencies must reflect the law in effect at the time the agency makes a final determination on a pending application") (citing *Ziffrin*).

Undeterred by its prior pronouncements, EPA now contends that the Latin maxim *actus curiae neminem gravabit*, as applied in the Supreme Court's 1880 decision in *Mitchell v. Overman*, 103 U.S. 62 (1880), provides judicial support for EPA's "grandfathering" approach. *See* SSB at 9-10 [PER 52-53]; RTC at 61-65

42

[PER 134-38].  Translated to "an act of the court shall prejudice no one," this maxim stands for the principle that a court has the power to enter a judgment retrospectively when the court is responsible for creating a delay in rendering the judgment.  *See Mitchell*, 103 U.S. at 64-65.  EPA argues that this principle applies equally to administrative agencies and "supports the view that an administrative agency has the power in limited and compelling circumstances to issue a permit decision based on the legal requirements that were applicable at the time the Agency should have taken action."  SSB at 10 [PER 53]; RTC at 62 [PER 135].

EPA's attempt to rely on *Mitchell* represents a basic misunderstanding of the inherent powers of the government branches.  *Mitchell* speaks only to the powers of the judicial branch.  *See Mitchell*, 103 U.S. at 64 (noting that because no statute applies, the case "must…be determined by the rules of practice which obtain in courts of justice in virtue of the inherent power they possess").  Article III of the United States Constitution vests the judicial branch with certain inherent powers and duties, including the duty "to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803); U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.").  The concept of *actus curiae neminem gravabit* is itself founded on this inherent judicial authority to administer justice.  *See Mitchell*, 103 U.S. at 65 ("In such cases, upon the maxim

43

*actus curiae neminem gravabit,*…it is the duty of the court to see that the parties shall not suffer by the delay.").

Courts have long held that administrative agencies do not possess the same inherent equitable powers or authority as Article III courts. *See N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 59 (1982) ("The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III"). An administrative agency is "a creature of statute." *Soriano v. United States*, 494 F.2d 681, 683 (9th Cir. 1974). An agency "has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). Thus, "if there is no statute conferring authority, a federal agency has none." *Michigan*, 268 F.3d at 1081; *see also Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374-75 (1986) ("An agency may not confer power upon itself."). EPA cannot compensate for its lack of statutory authority by relying on a Latin maxim or a judicial opinion discussing inherent judicial powers to provide itself with "equitable" authority not granted by statute.

In fact, EPA cites only one case for the proposition that *actus curiae neminem gravabit* might be available to an administrative agency. *See* SSB at 10 [PER 53]; RTC at 62-64 [PER 135-37] (citing *Application of Martini*, 184 F. Supp. 395, 401-02 (S.D.N.Y. 1960)). Yet EPA's reliance on this single, out-of-circuit district court case is weak and misplaced. *Martini* involved an application for naturalization in accordance with Public Law 114. *See Martini*, 184 F. Supp. at 398. The petitioner submitted his application but, because of a delay by the agency, was issued a warrant of arrest and ordered deported. *Id*. The agency concluded that naturalization was barred by section 318 of the Immigration and Nationality Act, which automatically denies naturalization to applicants against whom a deportation order has been issued. *Id*. at 398-99. The court held, however, that section 318 did not apply to applicants under Public Law 114 and that Congress could not have intended the applicant to lose its rights under Public Law 114 as a result of agency delay. *Id*. at 399-401.

The court in *Martini*, however, in no way permitted an administrative agency to violate statutory mandates, *see id*. at 399-401, and EPA's attempt here to waive plain requirements of the Act cannot be reconciled with that decision. Congress's intent and purposes in section 165 of the Clean Air Act are clear: a source cannot be built if it fails to demonstrate that it will not cause or contribute to a violation of any national ambient air quality standard or fails to apply best

45

available control technology for all regulated pollutants. Nothing in *Martini* suggests that equitable considerations can be used by an administrative agency to frustrate these express statutory requirements.

In sum, EPA's "grandfathering" approach for the Avenal Permit cannot constitute a permissible construction of the statute given its direct conflict with Congress' expressed intent regarding the purposes of the PSD permitting program and the Agency's own prior interpretations of section 165. In addition, EPA's claim of equitable power to "grandfather" the Project lacks any legal basis. Therefore, this Court must reject EPA's erroneous interpretation of the Act.

## II. EPA Acted Arbitrarily and Capriciously When its Environmental Justice Analysis Failed to Identify and Address Disproportionate Health and Environmental Effects.

The communities of Avenal, Huron, and Kettleman City, which surround the Avenal Project, meet EPA's low-income and minority criteria because of their very high (more than 85 percent) minority populations, high linguistic isolation, and high poverty rate. SSB at 17-18 [PER at 60-61]; *see id*. at Appendix 1 (Demographic maps) [PER 74-80]. Based on this information, EPA prepared an Environmental Justice Analysis for the Avenal Project. *See id*. at 12-28 [PER 55-71].

Despite recognizing that these communities already experience disproportionate health impacts due to poor air quality, *id*. at 23 [PER 66], and

46

despite recognizing the adverse impact $NO_2$ exposure has on respiratory health, *id*. at 20 [PER 63], EPA failed to consider relevant data and reach a conclusion about the specific human health or environmental impacts of short-term exposure to $NO_2$ emissions from the Avenal Project on minority and low-income populations.  *Id*. at 27 [PER 70].  As set forth below, this failure occurred even though evidence in the record indicated that the Project's $NO_2$ emissions would cause air quality to exceed the $NO_2$ standard.

EPA's approval of the PSD permit under these conditions is arbitrary and capricious because EPA (1) failed to identify disproportionate impacts; and (2) failed to consider relevant evidence in the record that the Project would, in fact, disproportionately impact low-income and minority populations.

### A.  EPA Had An Affirmative Duty to Identify the Project's Short-Term $NO_2$ Impacts on Low-Income and Minority Populations.

In 1994, President Clinton recognized the disproportionate health and environmental impacts routinely faced by minority and low-income communities and signed Executive Order 12898, which requires federal agencies to identify and address, when appropriate, "disproportionately high and adverse human health and environmental effects of [their] programs, policies, and activities on minority and low-income populations."  59 Fed. Reg. at 7,629.  Based on this Executive Order, the Environmental Appeals Board requires that EPA perform an Environmental Justice Analysis when it issues PSD permits.  *See, e.g., In re Prairie State*

47

*Generating Company*, 13 E.A.D. 1, 123 (EAB 2006); *In re Knauf Fiber Glass, GmbH*, 8 E.A.D. 121, 174-75 (EAB 1999).

EPA acknowledges that it must perform an Environmental Justice Analysis for the Avenal Project. SSB at 12 [PER 55]. However, in its Responses to Comments, EPA alleges that Executive Order 12898 does not require it "to reach a definitive determination that the Project will not result in disproportionate adverse impacts with respect to short-term NOx emissions." RTC at 87-88, 91 [PER 141-43]. EPA cannot simply disregard the requirement to identify environmental justice issues whenever it finds that "the available data are limited." *Id*. at 87, 91 [PER 141, 143]. In addition, the alleged limitation in data resulted from EPA's own unlawful decision to "grandfather" the Project from the required demonstrations under section 165 and therefore cannot support EPA's decision.

By implementing Executive Order 12898 within the context of EPA's PSD permitting program, the Environmental Appeals Board established an affirmative duty for EPA to identify health and environmental impacts on nearby low-income and minority populations prior to issuing a PSD permit. EPA's failure to identify the environmental justice impacts on nearby communities is arbitrary and capricious.

**B.     EPA Failed to Consider Evidence that the Avenal Project Disproportionately Impacts Low-Income and Minority Populations.**

In the Environmental Justice Analysis, EPA stated that it was unable to reach any conclusion on the health and environmental impacts from short-term exposure to the Project's $NO_2$ emissions.   SSB at 27 [PER 70].  In its Responses to Comments, and without any additional analysis, EPA modified its conclusion, stating:

> EPA has not identified disproportionate adverse impacts on minority communities and low-income communities that would result from our proposed PSD permitting action that should affect issuance of this PSD permit. . . . [D]espite some uncertainties and limitations in available data, emissions from this source are unlikely to add significant environmental harm to the local communities.

RTC at 83 [PER 140].  Neither EPA's finding of "inconclusive impact" in the Environmental Justice Analysis, nor its subsequent finding of "no impact" in its Responses to Comments are supported by evidence in the record.

EPA must "consider the best available data that are germane in light of the scope and nature of the action before us in analyzing whether there may be disproportionate adverse impacts on minority communities and low-income communities." *Id*. (citing *In re Shell Gulf of Mexico, Inc. and Shell Offshore, Inc.*, OCS Appeal Nos. 10-1 to 10-4, slip op. at 80 n.87, 15 E.A.D. ___ (EAB Dec. 30, 2010) (Attachment C hereto)).

49

Here, evidence in the record indicates that the Project will, in fact, disproportionately impact nearby minority and low-income populations. However, EPA specifically failed to consider (1) monitoring data on background $NO_2$ emissions in the vicinity of the Project; (2) expected short-term $NO_2$ emission increases associated with near roadway impacts in Kettleman City; and (3) the local air district's assessment of 1-hour $NO_2$ emissions. The evidence before EPA demonstrated that the Project's $NO_2$ emissions will cause an exceedence of the 1-hour $NO_2$ national ambient air quality standard, the benchmark upon which EPA determines that a proposed facility will have disproportionately high and adverse human health or environmental effects. *See* SSB at 12 [PER 55]. Additionally, EPA cites no evidence indicating that the Project's emissions are below the applicable NAAQS. *See id.* at 26-27 [PER 69-70].

EPA's decision to issue the PSD permit when it failed to examine relevant data and articulate a rational connection between the evidence in the record and its findings of "inconclusive impact" and "no impact" must be reversed as arbitrary and capricious.

### 1. Monitoring Data From Hanford and Visalia.

EPA indicates that the closest existing monitoring stations measuring short-term $NO_2$ are located in Hanford and Visalia with respective $NO_2$ levels of 50 ppm and 61 ppm. *Id.* at 26 [PER 69]. EPA estimates the Avenal Project's maximum

50

hourly $NO_2$ impact to be 44 ppb or 44 percent of the 1-hour national ambient air quality standard (100 ppb). *Id*. at 27 [PER 70]. Despite possessing both background data and Project emissions data, EPA inexplicably concludes that it does "not have an acceptable analysis prepared for PSD purposes that provides a detailed comparison of the facility's emissions, as well as background and nearby sources, with the 1-hour $NO_2$ NAAQS." *Id*.

This finding ignores that the available evidence shows that the Project's emissions added to background conditions results in emission levels between 91 and 102 ppb, nearly exceeding or exceeding the 1-hour $NO_2$ national ambient air quality standard (100 ppb). Despite the simplicity of this calculation, the Environmental Justice Analysis fails to extrapolate any conclusion from the best available data on background emission levels. Nor does EPA explain why it would be inappropriate to use Hanford and Visalia background levels in its analysis.

### 2. Near Roadway Impacts.

Evidence in the record indicates that background $NO_2$ levels in Hanford and Visalia under-represent emissions in the project vicinity. EPA acknowledges that "$NO_2$ concentrations on or near major roads are appreciably higher than those measured at monitors in the current network [such as Hanford and Visalia] . . . and near-roadway concentrations have been measured to be approximately 30 to 100% higher than those measured away from major roads." *Id*. at 19 [PER 62].

51

Kettleman City is directly adjacent to Interstate 5, one of the State's main commerce freeways. *Id*. at 16-17 [PER 59-60]; *see also id*. at Appendix 1, Figure 1 [PER 74]. Given EPA's own assessment of near roadway impacts, the agency should expect Kettleman City to have $NO_2$ background levels of at least 65 ppb (30 percent greater than Hanford's 50 ppb background level) and as high as 130 ppb (100 percent greater than Visalia's 65 ppb). Given these estimates, the Project would result in $NO_2$ emission levels between 109 ppb and 174 ppb, well above the 100 ppb 1-hour $NO_2$ national ambient air quality standard.

### 3. Air District's $NO_2$ Analysis.

The local air district's analysis of the Project's 1-hour $NO_2$ emissions offers the most conclusive evidence of the Project's disproportionate impacts. The San Joaquin Valley Air Pollution Control District prepared an assessment of the Project's compliance with the State's 1-hour $NO_2$ standard as part of Avenal's application to the California Energy Commission. The assessment found that the Project's cumulative total impact for 1-hour $NO_2$ emissions (maximum facility impact and background) is 327.2 μg/m3 or 179 ppb. Letter from EPA Region 9 to Avenal Power Re Supplemental $NO_2$ Air Quality Impact Analysis (Aug. 12, 2010) ("EPA Response Letter"), Attachment 1 at 13 [PER 29]. This emission level,

52

while barely complying with the 1-hour $NO_2$ state standard,[6] is well above the 1-hour $NO_2$ national ambient air quality standard of 100 ppb.  *Id.*

Avenal Power and EPA extensively reference the air district's analysis in correspondence with each other.  *See id.*  However, EPA failed to disclose this evidence to the public or consider this evidence in its Environmental Justice Analysis.  *See* SSB at 27-28 [PER 70-71]; *see also* RTC at 87 [PER 141] (erroneously asserting that "[t]he analysis [in the Environmental Justice Analysis] describes what EPA believes is the best available data concerning impacts associated with the Project's short-term NOx emissions in the absence of approved PSD modeling analysis.").

EPA itself created the shortage of available data by exempting the Project from demonstrating compliance with the national 1-hour $NO_2$ standard.  EPA cannot simply throw up its hands and do nothing.  Rather, the Agency must perform the required analysis.  Given EPA's exemption, the air district's 1-hour $NO_2$ modeling is the best available evidence of the Project's $NO_2$-related impacts.  EPA abused its discretion by withholding the existing 1-hour $NO_2$ modeling data from its analysis.  *See In re Shell Gulf of Mexico*, slip op. at 80 n.87 (requiring EPA to consider "the best available data . . . in analyzing whether there may be

---

[6] The California Ambient Air Quality Standard for $NO_2$ is 180 ppb.

disproportionate adverse impacts on minority communities and low-income communities.").

EPA's findings of inconclusive impacts and no disproportionate impact in the face of this modeling data and the other above referenced evidence is the very definition of arbitrary agency action. *See Motor Vehicle. Mfrs. Ass'n*, 463 U.S. at 43 (EPA must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"); *see also Sierra Club*, --- F.3d ---, 2012 WL 164839, *11 (finding EPA's action arbitrary and capricious when the agency provided no rational basis for failing to consider relevant emissions data). Given all the evidence in the record, EPA's decision to issue the PSD Permit was arbitrary and capricious when EPA failed to consider evidence of $NO_2$ exposure in its Environmental Justice Analysis. EPA had no reasonable basis to conclude that it lacked sufficient data to determine the Project's impacts or that Kettleman City and the other nearby environmental justice communities would not be disproportionately impacted by $NO_2$ emissions from the Project.

## CONCLUSION AND RELIEF REQUESTED

EPA's decision to exempt the Avenal Energy Project from the requirements of section 165 of the Clean Air Act is contrary to the plain language, structure, and intent of the statute and cannot constitute a reasonable interpretation of the Act. In

addition, EPA's failure to identify and address the Project's disproportionately high and adverse human health effects on minority and low-income populations near the Project site cannot be reconciled with the Agency's own requirements for implementing Executive Order 12898 in PSD permitting decisions.

For the foregoing reasons, Petitioners request that this Court vacate EPA's approval of the PSD Permit for the Avenal Energy Project and instruct the Agency to deny the Permit immediately. *See Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006, 1026-27 (9th Cir. 2008) (explaining that vacatur was proper remedy when EPA acted outside of its authority and in defiance of Congress's clear intent)*; Sierra Club v. EPA*, 346 F.3d 955, 963 (9th Cir. 2003) (vacating EPA order and remanding with instructions where the administrative record was fully developed and conclusions following from the record were clear). Petitioners also ask that the Court award them their costs of litigation, including reasonable attorneys' fees, pursuant to section 307(f) of the Clean Air Act, 42 U.S.C. § 7607(f).

Dated:  February 24, 2012       Respectfully submitted,

/s/ George M. Torgun
PAUL R. CORT
GEORGE M. TORGUN

Attorneys for Petitioners Sierra Club, Center for Biological Diversity, and Greenaction for Health and Environmental Justice

/s/ Ingrid Brostrom
INGRID BROSTROM
BRENT NEWELL

Attorneys for Petitioner El Pueblo Para El
Aire y Agua Limpio

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, the foregoing opening brief is proportionately spaced, has a typeface of 14 points, and contains 12,966 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).


Dated:  February 24, 2012           /s/ George M. Torgun
                                    GEORGE M. TORGUN

                                    Attorney for Petitioners

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Petitioners hereby state that they are not aware of any related cases pending in this Court.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 24, 2012.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

In addition, I certify that I served by Overnight Mail one paper copy of Petitioners' Excerpts of Record on the persons listed below:

Stephanie J. Talbert
U.S. Department of Justice, ENRD
601 D St. NW
Washington, DC 20004

Gregory T. Broderick
Jane E. Luckhardt
Downey Brand, LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814

/s/ George M. Torgun
GEORGE M. TORGUN